**FOX ROTHSCHILD LLP**
**(formed in The Commonwealth Of Pennsylvania)**
2000 Market Street, Twentieth Floor
Philadelphia, PA 19103
(215) 299-2000 (phone)/(215) 299-6834 (fax)
Joshua T. Klein, Esquire (JK 8978)
Jason C. Manfrey, Esquire (JM 01175)
jklein@foxrothschild.com
jmanfrey@foxrothschild.com
*Proposed Attorneys for the Debtor*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| INNOVASYSTEMS, INC, | Case No. 11- |
| Debtor. | Hon. _____ |

John J. Waters, being first duly sworn upon oath, deposes and states as follows:

1.    I am the President, majority shareholder, and sole member of the Board of Directors (the "Board") of InnovaSystems, Inc. (the "Debtor", or the "Company"). I submit this Affidavit in support of the first day motions ("Motions") that the Company has filed in this Court seeking emergency relief following the commencement of its voluntary Chapter 11 case on September 2, 2011 (the "Petition Date"), under the 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

2.    I received my Bachelor of Science degree in Engineering from the University of Wisconsin in 1969. Prior to my employment with the Company, I was employed as a Business Unit Manager with Reohr Consulting Company. I founded the Company in 1989. Currently, I

serve as the President of the Company, a Director of the Company, as well as the majority

shareholder of the Company.

3.      Accordingly, I am familiar with the Company's books and records, which are

maintained in the ordinary course of business under my supervision, the Company's business and

financial history, its operations, and its current business and financial situation. Accordingly, if

called as a witness, I could and would competently testify to the matters set forth herein from my

own personal knowledge.

## COMPANY BACKGROUND

### A.    The Company

4.      The Company is a New Jersey corporation organized under the laws of the state

of New Jersey.

5.      On November 30, 1989, pursuant to certain articles of incorporation filed in the

State of New Jersey, the Company was formed.

6.      The Company is a technology engineering company. The Company's clients are

academic, biotechnology, chemical, environmental, food, government, petrochemical and

pharmaceutical companies and laboratories that have the goals of improving productivity,

accuracy and reproducibility of laboratory results. The Company achieves these goals for its

clients through the implementation of certain services including mechanical design and

development, electrical engineering, hardware and software development, machining; and

assembly, testing and support.

7.      The Company commenced this Chapter 11 case in order to obtain a breathing

spell from creditors while it negotiates a restructuring of its debts, which will permit the

Company to reorganize under Chapter 11.

2

## B.    Equity and Debt Structure

8.      The Company's equity structure as of the Petition Date - ownership of membership interests in the Company, on a fully diluted basis - is as follows:

|  | Amount (%) |
|---|---|
| John Waters | 97% |
| David Garbern | 3% |

9.      The Company is a borrower under several financing facilities, as set forth below.

### PNC Bank N.A.

10.     On November 30, 2000, the Company and PNC Bank N.A. ("PNC" or the "Prepetition Lender") entered into a loan agreement for a revolving line of credit (the "First PNC Line"). The First PNC Line is secured by liens in favor of PNC on all of the Company's inventory, chattel paper, accounts, equipment, and general intangibles, whether any of the foregoing is now or acquired later; all accessions, attachments, tools, parts, supplies, increases, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all proceeds relating to any of the foregoing (including insurance, general intangibles, instruments, rents, monies, payments and other account proceeds) (the "Collateral"). As of the Petition Date, approximately $148,500 remained due and owing on the First PNC Line.

11.     On December 13, 2000, the Company and PNC entered into a second loan agreement for a revolving line of credit (the "Second PNC Line"). In December of 2009, the Company and PNC entered into a promissory note agreement, modifying the Second PNC Line into a promissory note by and between the Company and PNC (the "Note" and collectively with the First PNC Line and the Second PNC Line, the "PNC Loan Agreements", together with all

documents, agreements and instruments now or hereafter evidencing, securing, guaranteeing, amending and/or restating, executed in connection with or relating in any way to the Prepetition Loan Agreements, collectively the "Prepetition Loan Documents"). The Note is secured by liens in favor of PNC on all of the Company's Collateral. As of the Petition Date, approximately $19,000.00 remained due and owing on the Note.

12.     PNC's Collateral, includes its liens on cash collateral (the "Cash Collateral") the Company receives from various sources, including proceeds of accounts receivable.

## C.     Events Leading to the Chapter 11 Filing

### Patent Action and Related Litigation

13.     On December 12, 2005, Proveris Scientific Corporation ("Proveris") brought an action claiming that the Company's Optical Spray Analyzer device (the "OSA Device") infringed Proveris' U.S. Patent No. 6,785,400 (the "400 Patent") in the United States District Court District of Massachusetts, captioned *Proveris Scientific Corp. v. InnovaSystems, Inc.* (Dec. Term, 2005, 12424-WGY) (the "Patent Action"). In March of 2007, the parties tried Proveris' infringement claims. After a five day trial, the District Court entered a directed verdict of infringement of claims 3-10 and 13. On March 30, 2007, the Jury returned a verdict that the Company had not infringed claims 1 and 2 of the 400 patent [Civil Docket No. 120]. The jury also found that Company's infringement of claims 3-10 and 13, as found by the District Court, was not willful. Id. The jury awarded Proveris no damages. On May 11, 2007, the District Court then entered a permanent injunction (the "Injunction") against the Company [Civil Docket No. 150].

14.     After the Injunction was entered in mid-2007, the Company endeavored to redesign the OSA Device in order to not run afoul of the 400 Patent or the Injunction. Among

4

other things, the Company retained the services of the Cermak Kenealy Vaidya & Nakajima
Firm (the "CKVN Firm"), to review the scope of claim 3 and claims 4-13 of the 400 Patent. The
result of these efforts was the Company's new product, the ADSA device (the "ASA Device").

15.     On March 3, 2010, Proveris filed a motion for contempt (the "Contempt Motion")
in the Patent Action against the Company claiming the ADSA device violated the Injunction
[Civil Docket No. 162]. On April 21, 2010, the District Court denied Proveris' Contempt
Motion. On September 21, 2010, the District Court issued the following order:

> In consideration of Proveris Scientific Corporation's Motion for Summary
> Judgment for Contempt dated June 6, 2010, this Court holds
> InnovaSystems, Inc. in contempt of court for violating this Court's
> permanent injunction order dated, May 11, 2007.

[Civil Docket No. 208] (the "Contempt Order").

16.     On October 21, 2010, the Company appealed the Contempt Order to the United
States Court of Appeals for the Federal Circuit (the "Federal Circuit Court"), captioned *Proveris
Scientific Corp. v. InnovaSystems, Inc.*, (Oct. Term, 2010, No. 11-1043). On May 27, 2011, the
Federal Circuit Court dismissed the appeal, without prejudice, because "the District Court has
not yet adjudicated the issue of sanctions." On July 15, 2011, the District Court set the matter
for a bench trial on September 6, 2011 on the issue of sanctions.

17.     Prior to the date set for the bench trial on the issue of sanctions, on March 18,
2011, the Company filed an Inter-Parties Reexamination Request filed against claims 3-13
(claims at issue) of the 400 Patent. The Company's Request for Inter Parties Reexamination
included 59 separate bases for rejection of claims 3-13 of the 400 Patent. Of the submitted
proposed rejections, 58 (*i.e.*, 98.3%) were adopted by the United States Patent and Trademark
Office (the "USPTO")—including all 9 grounds of rejections submitted regarding independent
claim 3. On June 29, 2011, the USPTO issued an Order for Re-Examination adopting *all* nine

5

(9) separate and distinct grounds submitted for rejection of independent claim 3 (the sole independent claim at issue in the 400 Patent) and nearly 60 total separate grounds of rejection for claims 3-13 of the 400 Patent.

18.     Additionally, on November 10, 2010, the Company's former counsel in the Patent Action, Spector Gadon & Rosen, P.C. ("Spector Gadon"), filed a civil action against the Company in the Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania, Civil Trial Division, captioned *Spector Gadon & Rosen, PC v. InnovaSystems, Inc.* (Nov. Term, 2010, No. 1011) (the "Spector Gadon Suit"). The Spector Gadon Suit is a breach of contract suit relating to unpaid legal fees to Spector Gadon for its previous representation of the Company in the Patent Action. On July 22, 2011, the Court of Common Pleas of Philadelphia County entered a judgment against the Company in the amount of $221,900.68, plus interest in the amount of $14,444.61.

19.     To make matters worse, on August 16, 2011, the Company's former counsel in the Patent Action, Becker Meisel LLC ("Becker Meisel"), filed a civil action against the Company in the Superior Court of New Jersey, captioned *Becker Meisel LLC v. InnovaSystems, Inc.* (Aug. Term, 2011, No. 6730) (the "Becker Meisel Suit"). The Becker Meisel Suit demands judgment against the Company in an amount in an amount in excess of $90,000 for unpaid attorneys' fees related to Becker Meisel's previous representation of the Company in the Patent Action.

## Increasing Costs and Declining Revenues

20.     For the taxable year ending 2008, the Company generated $2,323,597 in gross income. After deducting the Company's minor accounting and legal fees in the amount of

$53,630, and the Company's other expenses, the Company generated a profit in the amount of $205,711.

21.     For the taxable year ending 2009, the Company generated $1,642,148 in gross income. After deducting the Company's minor accounting and legal fees in the amount of $28,418, and the Company's other expenses, the Company generated a profit in the amount of $9,052.

22.     For the taxable year ending 2010, the Company generated $1,924,894 in gross income. The Company's expenses for legal fees soared to $217,945, which related to the Patent Action and Contempt Motion (as defined below) surrounding the Company's new device product known as the ASA Device (as defined below). After deducting the Company's cost of goods sold in the amount of $392,418, payroll and expenses in the amount of $598,360, and other expenses in the amount of $789,451, the Company generated a loss of ($73,280) for the taxable year ending 2010.

23.     As of the Petition Date, during the period of December 1, 2010 through August 31, 2011, the Company generated ($74,122) in losses on $1,076,441 in revenue. Due to the legal fees incurred in the Patent Action, and the Injunction prohibiting for the time being the sale of the ASA Device, the Company has suffered a decrease in revenues and has been forced to operate at a loss for 2010 and year to date.

## D.     First Day Motions

### Motion for Maintenance of Bank Accounts and Forms

24.     As of the Petition Date, the Company maintained two (2) bank accounts. A chart listing all of the Company's bank accounts (the "Bank Accounts") is attached to the motion seeking authority to use existing bank accounts and business forms as Exhibit A.

PH1 2911616v2 09/01/11

25.    In the ordinary course of business, the Company uses numerous varieties of business forms. To minimize expenses to its estate and avoid confusion on the part of employees, customers and vendors, the Company is requesting that the Court authorize the Company to continue to use all correspondence and business forms (including, without limitation, checks, letterhead, purchase orders and invoices (collectively, the "Business Forms") as such forms were in existence immediately before the Petition Date without reference to the Company's status as debtor-in-possession, *provided however,* that upon depletion of the Company's Business Form stock, the Company will obtain new check stock reflecting its status as debtor-in-possession. With such authorization, the Company will be able to avoid the expense and delay of ordering entirely new business forms.

26.    The Company's transition, into Chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of the cases with the same account numbers and, where applicable, automated relationships. I do not believe that allowing the Company to maintain the Bank Accounts will prejudice any party or the estate.

27.    If the Company is forced to close its Bank Accounts, disruption and confusion likely would result, which would negatively impact the Company and its efforts to maximize value for its stakeholders. Any unnecessary delay in processing payments for postpetition goods or services may adversely affect the Company's relationship with vendors and customers, which are already being burdened by the filing of the Chapter 11 Case.

### Motion for Authority and Approval to Use Cash Collateral

28.    The Company is requesting the (A) entry of an interim order (i) authorizing the Company's use of cash which may comprise cash collateral, (ii) granting adequate protection to the interests of the Prepetition Lender (as defined below), and (iii) granting related relief and (B)

8

scheduling a final hearing, pursuant to the terms contained in the proposed Interim Order filed with the Motion and the Budget to be filed with the Court.[1]

29.     As set forth previously herein, the Company is a borrower under the Prepetition Loan Documents and its obligations are secured by liens in favor of PNC on all of the Company's Collateral, including proceeds of accounts receivable.

30.     The Company urgently requires the Use of Cash Collateral in order to preserve and maintain the value of the prepetition collateral and the interests therein of the Prepetition Lender. Moreover, use of the Cash Collateral in the manner and for the purposes proposed will maintain the overall value of the Company's ongoing enterprise and enhance the chances of a successful outcome for this case. If the Company is precluded from making expenditures necessary to maintain the Company's assets, or if the Company is forced to effect a "fire-sale" liquidation of its assets, the Prepetition Lender, indeed all creditors — secured and unsecured — will be harmed.

31.     The Company requires the immediate use of Cash Collateral. Otherwise, it will be required to curtail its operations substantially with a concomitant immediate and irreparable harm to the value of its business and estate.

32.     I declare under penalty that to the best of my knowledge, the foregoing is true and correct.

_____
John J. Waters, President

Sworn to and Subscribed
Before me this _____ day
of _____, 2011

_____
Notary Public:

> **NOTARIAL SEAL**
> **MARY A OREO**
> **Notary Public**
> **PHILADELPHIA CITY, PHILADELPHIA CNTY**
> **My Commission Expires May 22, 2013**

---

[1] Due to the urgent nature of this filing, the Budget was not completed prior to the submission of the Motion and this Affidavit, but the Proposed Budget will be filed with the Court prior to any hearing on the First Day Motions.

PHI 2911616v2 09/01/11

My commission expires: _____

PH1 2911616v2 09/01/11